In re George Stevens SUTTON, Debtor.

No. 01–13377–WSS.

United States Bankruptcy Court,
S.D. Alabama.

Nov. 7, 2003.

Marion E. Wynne, Jr., Minette, AL, for Debtor.

Wendy Vann, Charles Baer, Counsel for the United States of America (Internal Revenue Service).

J.C. McAleer, III, Chapter 13 Trustee.

### ORDER ON DEBTOR'S OBJECTION TO CLAIM OF INTERNAL REVENUE SERVICE AND U.S. MOTION TO MODIFY PLAN PAYMENTS

WILLIAM S. SHULMAN, Chief Judge.

This matter came on for hearing on the Debtor's objection to the claim of the Internal Revenue Service ("IRS") and the United States of America's ("U.S.") motion to modify plan payments. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). After due consideration of the pleadings, briefs, testimony, evidence and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

The Debtor, George Stevens Sutton ("Dr. Sutton"), is a medical doctor, and is the sole owner and officer of Bay Area Community Medicine, P.C. ("Bay Area"). Dr. Sutton is 63 years old, and is in relatively good health except for hypertension, reflux disease, and prostate cancer. He employs two nurse practitioners to assist him, which is the maximum number allowed by state law. In 2000 and 2001, Dr. Sutton reduced his four office practice to one part-time office.

Dr. Sutton's practice is unique in that it consists primarily of nursing home patients.[1] He spends approximately 70 to 80 hours per week on site at the nursing homes. State law requires that nursing home patients be seen by a doctor for a certain number of times. Since most doctors do not go to nursing homes, the nursing home administrators arrange with certain physicians to come to the nursing home. Selecting which doctor to see patients is solely within the discretion of the nursing home administrator, and the physician has no control over the decision. Dr. Sutton currently sees patients at five nursing homes. While the number of nursing homes that he services has increased, the overall number of patients has

---

1. Dr. Sutton does maintain a private office where he sees patients other than nursing home patients.

decreased. An administrator of one of the nursing homes that Dr. Sutton served recently reassigned some of his patients to another doctor.

Dr. Sutton approached two area hospitals, Springhill Memorial and Mobile Infirmary, about selling his practice, but the hospitals were not interested. Dr. Sutton testified that he is the only physician who sees nursing home patients on a full-time basis. Other doctors see nursing home patients on a part-time basis while maintaining a private practice.

The Suttons were married in 1997. Responding to a cash flow problem in his practice, Dr. Sutton fired his office manager and five other employees and hired Mrs. Sutton as the office manager in 2000. Mrs. Sutton handles all administrative duties for his office, including billing, insurance claims, transcription, medical records, payroll, accounts receivable and accounts payable. After assuming her duties as office manager, Mrs. Sutton found that much of the insurance billing for Dr. Sutton's practice was two to six weeks behind. Mrs. Sutton explained that most of Dr. Sutton's patients are covered by Medicare, but they also have private insurance that will pay the balance of a bill that Medicare does not cover. Mrs. Sutton testified that Dr. Sutton's previous staff often failed to bill the patients' secondary and tertiary insurance. Mrs. Sutton resubmitted claims to Medicare and the private insurers to collect the unpaid balances. The entire process took about six months. Mrs. Sutton testified that the re-billing of the private insurers increased the revenue for Dr. Sutton's practice in 2000 and 2001 by approximately $180,000.00. She also stated that budget cuts for Alabama greatly impact the amount that Medicaid pays for care for nursing home patients. Since her husband's practice is heavily based on his nursing home patients, his income can be drastically affected by decreases in Medicare benefits.

Mrs. Sutton is the 100% owner of a management company, Whitefish Management, Inc. To date, Dr. Sutton's practice is Whitefish's only client. She works for Dr. Sutton's practice eight to ten hours per day, six to seven days per week. Mrs. Sutton employs one part-time worker. Mrs. Sutton testified that she formed Whitefish on the advice of her accountant. Prior to forming Whitefish, Mrs. Sutton received a salary from Bay Area. Since she formed Whitefish in 2001, Bay Area pays Whitefish management fees.

Dr. Sutton filed his chapter 13 petition on July 6, 2001. The plan was confirmed on August 30, 2001 at 4% to unsecured creditors. Dr. Sutton's statement of financial affairs show his total income for 2000 as $102,000.00. However, his 2000 federal income tax return shows a total income of $201,346.00. On Schedule I of Dr. Sutton's petition, his total monthly income, without deductions, of $12,871 or $154,452.00 annually. Dr. Sutton's 2001 federal income tax return reports income of $285,728.00.

In his original schedules, Dr. Sutton did not indicate that he was married, and his schedules I and J did not list Mrs. Sutton's income or expenses. On July 1, 2003, he filed amended schedules I and J, which included Mrs. Sutton's income and expenses. In his amended schedules, Dr. Sutton listed a gross monthly income of $16,020.26, or $192,143.02 annually, compared to $12,871.00 ($154,452.00 annually) on his original schedules. According to Dr. Sutton's amended schedule I, Mrs. Sutton earns a gross monthly income of $14,980.79, or $179,760.00. In a report prepared by the Debtor's expert on February 5, 2003, Mrs. Sutton admitted earning $214,000.00 per year. According to Dr. Sutton's amended schedule I, Mrs. Sutton earns approximately $8,959.70 per

month net income after payroll deductions, or $107,000.00 on an annual basis. The mortgage payment of $1,969.49 listed on Amended Schedule J is the mortgage payment for her house. The amended Schedule J also includes $803.33 for home expenses. She also owns a house in Montana as an investment and the $2,919.00 mortgage payment for the Montana home has been listed on Amended Schedule J as an expense. Dr. Sutton also lists a $1,244.68 expense for life insurance. Mrs. Sutton testified that this expense is for a life insurance policy that she owns.

Rick Lovett is the accountant for Bay Area, Dr. and Mrs. Sutton, and Whitefish Management. Lovett testified that he was able to quantify the increase in revenue from Mrs. Sutton's collection efforts at $40,000—$50,000.00 in 2001. Lovett prepared financial statements for Bay Area in 2000 and 2001. Dr. Sutton had $71,000.00 in distribution from Bay Area in 2000. In 2002, Dr. Sutton received $139,000.00 from Bay Area. In 2001, he received $173,938.00 in distributions from Bay Area.

Dr. Sutton chose Larry H. Montgomery ("Montgomery") as his expert to determine the income stream for his medical practice. Montgomery worked for twenty years in hospital administration, including time as the chief financial officer of a large for profit hospital. In 1996, he opened his own consulting firm, working primarily with physician's offices. Montgomery prepared two *pro formas* for Dr. Sutton's practice, one in January 2003 and one in June 2003.

Montgomery used financial statements from 1999 to 2002 as well as monthly patient treatment, payment and collection summaries for periods January 1999 to July 2001. He also used the insurance explanation of benefits from 2001. To establish revenues and collections for Dr. Sutton's practice, Montgomery began by calculating the number of procedures Dr. Sutton performed in a given year and the total number of procedures performed in each category. This information came from the medical codes listed on the insurance forms. Montgomery's data indicated an increase in visits from 15,074 in 2000 to 20,383 in 2001, which he attributed to the hiring of two nurse practitioners. Montgomery admitted that he would typically estimate future earnings using actual amounts from prior years as a base, but, based on his discussions with Mrs. Sutton and a test of receipts, the prior years' earnings included not only current year receivables but also amounts produced from previous years outstanding accounts receivable.

Montgomery determined the source of payment from the "explanation of benefits" information on insurance forms.[2] Approximately 90 percent of the revenue for Dr. Sutton's practice comes from Medicare, the Medicare HMO United Health Care, and Medicaid. To determine the amount of revenue from primary insurers, Montgomery used 2001 fee schedules for Medicare, Blue Cross, Medicare and others in the payor mix.

Significant in this revenue calculation is the Medicare conversion factor, which is set by the Department of Human Resources on a yearly basis. The conversion factor determines how much Medicare pays a physician for a certain procedure. Each CPT (or "Code procedure term") is assigned a value, starting at 1; the value is then multiplied by the conversion factor to determine the amount the doctor is paid for a certain procedure. The conversion factor for 2002 was 36.1992; therefore, a

---

**2.** Montgomery calculated the "payor mix" of insurers for Dr. Sutton's practice to include Medicare, Medicare HMO–United Health-Care, Medicaid, Blue Cross and others.

procedure with a value of 1 would earn the doctor $36.20. The conversion factor for 2003 is 34.5920. There is no accurate way to predict the Medicare conversion factor. Montgomery testified that the Medicare conversion factor has a significant impact on the revenue earned by Dr. Sutton's practice because his practice is so heavily based in nursing home patients. Montgomery concluded that based on the decrease of the Medicare conversion factor for the two previous years and the fact that the conversion factor between 1999 and 2003 is flat, collections are expected to remain flat in future years. He admitted that collections could increase if the Medicare conversion factor increased in the future.

Maurice Mitchell ("Mitchell"), a certified public accountant with advanced certification in business valuation, conducted two business valuation reports for Bay Area at Dr. Sutton's request. The report dated February 5, 2003 valued Bay Area as of January 9, 2003; the second report dated June 30, 2003 valued the business as of August 20, 2001. The United States chose Robert Holliman ("Holliman"), also a certified public accountant with advanced certification in business valuation, to estimate the value of Bay Area. Holliman prepared two reports for the United States, one valuing Bay Area as of August 30, 2001 and one valuing Bay Area as of January 9, 2003. The valuations for each expert is listed below:

| | Mitchell | Holliman |
|---|---|---|
| Value as of August 2001 | $280,000.00 | $431,000.00 |
| Value as of January 2003 | $160,000.00 | $493,000.00 |

Both experts agreed on the methodology for evaluating Bay Area. One of the differences between the two expert's valuations is the earnings base used in their calculations. Mitchell used the earnings base calculated by Montgomery (outlined above). Holliman used actual historical earnings. Another difference was the growth rate for Bay Area. Mitchell used a 0 % growth rate projected over five years. Holliman used a 3.22% growth rate projected over ten years in his report of value as of August 2001. Mitchell does not recommend a ten year projection in the health care industry. A final point of divergence is the marketability discount rate. Mitchell gave Bay Area a higher marketability discount rate of 45%, given the market area, the payor mix, and the practice model. Mitchell noted that Dr. Sutton had offered to sell the practice to area hospitals and received no offers. The practice is not desirable to a new physician due to the large number of patients dependant on Medicare. The practice generates fees on the lower end of the pay scale. Dr. Sutton's ability to treat nursing home patients is dependant on the decisions of the nursing home administrator. Mitchell believes it would take an aggressive marketing strategy to sell Dr. Sutton's practice. In contrast, Holliman assigned a 31.4% marketability discount rate.

Mitchell testified that he did not make an adjustment for revenue generated by Mrs. Sutton's collections in 2001. He was not able to quantify any increase in revenue based on Mrs. Sutton's re-billing of insurance. The changes in Dr. Sutton's practice closing some of his offices and hiring two nurse practitioners could have accounted for the increase in revenue. Mitchell did reduce Mrs. Sutton's salary from $200,000.00 to $40-50,000.00 for purposes of calculating expenses. Mitchell explained that the $40,000–$50,000 was the amount typically paid for the type of work that Mrs. Sutton does for Bay Area. Mitchell noted Bay Area's revenue increased from 1999 to 2000 and from 2000 to 2001. It remained flat for 2001 to 2002 and has declined in 2003. Mitchell used a discount rate of 24.3% for Bay Area.

Holliman testified that while the health care industry has service bureaus that handle billing and insurance claims for physicians' offices for a 5–7% fee, it is more efficient for smaller practices to use software available to handle billing and insurance in the office. He focused on estimating the income stream from Bay Area. To do this, he reviewed Bay Area's financial statements for 1999, 2000 and 2003; Dr. Sutton's tax returns for 1999 and 2000; monthly patient accounts receivable summaries from January 1999 to June 2002; Bay Area's general ledger for 1999 and 2002; payroll tax records and the articles of incorporation. Holliman stated that consultants generally use historical earnings to estimate future earnings unless historical information is not available. He chose an income approach to valuing Bay Area.

Holliman did not find that a ten year projection for the growth rate was unreasonable or impossible to determine because one must choose some point short of perpetuity. From 2000 to 2002, Bay Area had a 12.6% growth rate. Holliman assigned a 3.22% growth rate, and believes it to be conservative. Holliman assigned a 24.79% discount rate to Bay Area because the limited nature of a nursing home practice. Holliman did not consider Dr. Sutton's age and health in his valuation. He also made no allowance for good will.

### CONCLUSIONS OF LAW

#### Motion to modify Chapter 13 plan

■ The basis for this motion to modify the debtor's plan payments was the allegation that Dr. Sutton did not file schedules that accurately described his income and expenses. As outlined above, for the year 2000, Dr. Sutton's tax returns showed $100,000 more gross income than his statement of financial affairs filed with the Court. His 2001 tax returns reported more than $130,000 in income than Schedule I revealed. Dr. Sutton amended Schedules I and J of his petition on July 1, 2003, shortly before a hearing on the objection to the IRS's claim. The new Schedule I indicated gross income for approximately $38,000 more than his original Schedule I.

Section 1329 of the Bankruptcy Code controls modifications of confirmed bankruptcy plans under chapter 13 and provides in pertinent part as follows:

(a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments; or

(3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

(b) (1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.

(2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.

■ In its motion to modify payments, the U.S. has sought to do that which is authorized under the Code. According to the terms of § 1329, the debtor, the trustee or an unsecured creditor have an absolute right to request modification of the plan between confirmation of the plan and

completion of the plan payments. Section 1329(a); *In re Powers,* 140 B.R. 476, 478 (Bankr.N.D.Ill.1992).

This Court has considered the facts in this case and has observed the demeanor of the witnesses. Dr. Sutton certainly did not direct sufficient attention to the details of his finances at the time he filed. He did not consult with his accountant regarding the status of his income and expenses. He did not originally submit the income and expenses of his wife, which, as shown in the facts, were quite substantial. Dr. Sutton admitted that he paid more attention to his patients than to the administrative side of his practice, with the result being inadequate and incorrect Schedules I and J being filed with his original petition and plan. The information provided by the debtor gave a distorted picture of the state of his finances The result was a confirmation based on financial information that diverged substantially from his actual income and expenses. If these facts were known at the time of confirmation, the Court would not have confirmed the plan unless payments and the percentage of repayment to unsecured creditors were increased.

In the case of *In re Thomas,* 291 B.R. 189 (Bankr.M.D.Ala.2003), a Chapter 13 Trustee moved to modify the debtor's confirmed Chapter 13 plan in order to increase the percentage of repayment of unsecured debt. The debtor had substantially undervalued her equity in her homestead, and when it was destroyed by fire, the amount of the insurance check exceeded the liens against the property by approximately $25,000. The funds were submitted to the trustee, who then filed the motion to modify the plan. The court carefully considered the standard necessary to modify a confirmed plan, and noted two lines of authority on the issue. The first line of cases has held that modification will be allowed so long as the modified plan meets the three statutorily mandated conditions. *In re Thomas,* 291 B.R. at 192, citing *Barbosa v. Soloman,* 235 F.3d 31, 38–41 (1st Cir.2000); *In re Witkowski,* 16 F.3d 739, 748 (7th Cir.1994); *Ledford v. Brown,* 219 B.R. 191, 195 (6th Cir. BAP 1998); *In re Meeks,* 237 B.R. 856, 859–60 (Bankr.M.D.Fla.1999); *In re Studer,* 237 B.R. 189, 193 (Bankr.M.D.Fla.1998). A second line of cases finds that a confirmed Chapter 13 plan may not be modified unless there is a substantial change in the debtor's circumstances. *In re Thomas,* 291 B.R. at 193, citing *Arnold v. Weast,* 869 F.2d 240, 243 (4th Cir.1989); *In re Euler,* 251 B.R. 740, 743–7 (Bankr. M.D.Fla.2000); *Collier v. Valley Federal Savings Bank,* 198 B.R. 816 (Bankr. N.D.Ala.1996); *In re McCray,* 172 B.R. 154, 158 (Bankr.S.D.Ga.1994); *In re Duke,* 153 B.R. 913, 918–19 (Bankr.N.D.Ala. 1993).

In oral argument, Dr. Sutton argued that the common law doctrine of *res judicata* would prevent the Court from modifying the payments. Section 1329 clearly allows for modification of plan payments. "...(T)he clear and unambiguous language of § 1329 negates any threshold change in circumstances requirement and clearly demonstrates that the doctrine of *res judicata* does not apply." *Witkowski,* 16 F.3d at 746.

Under the facts in this case, and based on the reasoning in *Thomas,* the Court holds that the "substantial change" requirement should not be imposed, and that the motion to modify by increasing the payments is due to be granted. The Court will set this matter for a hearing to determine from the amended schedules what income and expenses should be considered for purposes of recalculation of the payment. After the payment has been calculated, Dr. Sutton shall begin making said

payment for the remainder of the case, or until further order of this Court.

### Debtor's Objection to Claim of IRS

 The IRS has filed a proof of claim for unpaid federal income taxes totaling $374,056.66. Of that amount $260,723.33 plus interest and other statutory additions is claimed as secured. Dr. Sutton has objected to the claim and disputes the amount that is actually secured. At issue is the value of his medical practice. Dr. Sutton intends to keep his medical practice and maintain ownership in his professional corporation. He has conceded that the appropriate valuation method is to value the practice as a going concern based on its fair market value.

In order to determine the value of the collateral, the Court must determine the date that the medical practice should be valued. Determination of the secured status of claims is found in 11 U.S.C. § 506. It provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use on a plan affecting such creditors interest." 11 U.S.C. § 506(a).

In this case, the IRS has sought to modify the payments under the plan, because of inaccurate schedules filed by the Dr. Sutton. For the reasons stated above, the Court has granted that motion. Dr. Sutton, apparently through his objection to the claim of the IRS, asserts that the Court should use the date of the hearing on its objection to claim or the effective date of the modified plan as the date of valuation. When a plan is modified, the liquidation analysis of § 1325(a)(4) applies to the modification. 11 U.S.C. § 1329(b)(1).

As shown in the findings of fact, Dr. Sutton's experts valued the medical prac-

tice significantly less as of the hearing date, than at the time of the petition filing or confirmation. He urges that the Court follow those cases that hold that "modification of a plan is essentially a new confirmation and must be consistent with the statutory requirements for confirmation." *In re Powers*, 202 B.R. 618, 623 (9th Cir. BAP 1996). This would mean that for purposes of applying the liquidation test of § 1325(a)(4), the value to be distributed would be determined as of the date the plan is modified.

 In the instant case, however, the IRS's motion to modify relates to the fact that he grossly understated his income on his original schedules and did not disclose his wife's income on expenses. Further, his objection to claim should not be construed as a motion to modify his plan of reorganization post petition pursuant to 11 U.S.C. § 1329. An objection to a claim is an improper attempt to modify a plan and does not put creditors on notice of the true intention of the debtor. *In re Davis*, 314 F.3d 567 (11th Cir.2002) (noting that procedures for disallowance of a claim are set forth in § 502 and vacating the Chapter 13 discharge on procedural grounds where the trustee unilaterally modified the plan by changing the secured creditor's deficiency to an unsecured claim after the creditor was permitted to recover and dispose of secured property). A post-confirmation modification of a Chapter 13 plan is not allowed for purposes of shifting the burden of depreciation or reduction in value of an asset to a creditor. *Chrysler Financial Corp. v. Nolan*, 232 F.3d 528 (6th Cir.2000)(holding that § 1329 does not permit post-confirmation reclassification of a previously allowed claim).

 Section 502 of the Bankruptcy Code governs the allowance or disallowance of claims. That statute states that,

except with respect to circumstances that are not relevant in this case, a claim is determined "as of the date of the filing of the petition." 11 U.S.C. § 502(b). Thus, the concept of value under 11 U.S.C. § 506(a) is flexible, depending on the particular context in which the valuation is to take place. 4 *Collier on Bankruptcy,* § 506.03[10] at 506–99 (15th Ed. Rev. 1996). After considering the facts in this case, the Court concludes that the Dr. Sutton's medical practice should be valued as of the date of the original petition.[3]

The Court must now consider the expert opinions regarding the valuation of Dr. Sutton's medical practice. As discussed in the facts set forth above, there were several significant differences between the valuations of Mitchell and Holliman as of August 2001. With respect to Mitchell's report, he used the earnings base calculated by Dr. Sutton's other expert, Larry Montgomery. Mr. Holliman used actual historical earnings. The calculations made by Mr. Montgomery were focused not only on the financial statements and summaries, but also on the actual number of procedures performed by Dr. Sutton. Since Dr. Sutton's practice is limited almost entirely to Medicare and Medicaid, the revenue is subject to a Medicare conversion factor. It is the opinion of the Court, after carefully reviewing the evidence, that Montgomery's calculations which were used by Mitchell in his analysis presents a more concentrated financial picture with respect to valuation.

However, Mitchell used a 0% growth rate while Holliman used a 3.22% growth rate. Another difference between the reports was that Mitchell assigned a 45% marketability discount rate while Holliman used a 31.4% marketability discount rate.

Mitchell testified that Dr. Sutton's practice is not desirable to a new physician and generates low fees. After considering the evidence, the Court concludes that the growth rate for this practice will almost certainly be more than 0%, although it may not reach 3.22%. In addition, the marketability discount rate gives a wide latitude for the value to fluctuate, depending on which rate is used. The Court, having considered these factors, determines that the value of the medical practice as of the filing date of the Chapter 13 is $325,000. Therefore, the Court overrules the objection of Dr. Sutton to the claim of the IRS and shall allow its claim as secured in the amount of $260,723.33 plus interest and statutory additions as provided for by law, and the balance of the claim shall be allowed as filed.

It is hereby

**ORDERED** that the motion to modify plan payments of the United States is GRANTED, and a hearing is set for *MONDAY, DECEMBER 1, 2003 AT 9:30 A.M. at the U.S. Bankruptcy Court, 201 St. Louis Street, Mobile, Alabama* to determine a new plan payment; and it is further

**ORDERED** that the debtor's objection to the claim of the Internal Revenue Service is OVERRULED, and the IRS's claim is ALLOWED as secured in the amount of $260,723.33 plus interest and statutory additions as provided by law with the balance to be allowed as filed.

---

**3.** Since confirmation was less than sixty days after the petition date, there is little, if any, distinction between the value of the medical practice as of the confirmation date and the date of the petition.